**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **KEVIN T.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 21 C 2265 |
| ) | |
| **KILOLO KIJAKAZI,** Acting ) | Magistrate Judge Finnegan |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## ORDER

Plaintiff Kevin T. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the ALJ's decision. After careful review of the record and the parties' respective arguments, the Court finds that the case must be remanded for further proceedings.

## BACKGROUND

Plaintiff protectively filed for DIB on May 8, 2019, alleging disability since October 5, 2018 due to schizophrenia, diabetes, hypertension, GERD, migraines, a double hernia,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to Fed. R. Civ. P. 25(d).

high cholesterol, an enlarged prostate, and carpel tunnel syndrome. (R. 18, 210-16, 227-28). Born in 1960, Plaintiff was 58 years old as of the alleged disability onset date, making him a person of advanced age (age 55 or older). (R. 235); 20 C.F.R. § 404.1563(e). He subsequently changed age categories to a person closely approaching retirement age (age 60 or older). (R. 31); 20 C.F.R. § 404.1563(e). Plaintiff has a high school equivalency GED and lives alone in the basement apartment of a building owned by his sister. (R. 45-46, 51, 228, 463). Plaintiff spent over 19 years working for a hair product manufacturer, driving a narrow-aisle vehicle and using machinery to load and unload skids and chemicals. (R. 54-57, 229, 238). He held that job until October 2018 when he was let go as part of a mass layoff. (R. 59, 75). Thereafter, Plaintiff worked for a temporary staffing company in June of 2019 but was let go after two days. (R. 59, 76-77, 463). Plaintiff has not engaged in any substantial gainful activity since the alleged onset date. (R. 21).

The Social Security Administration denied Plaintiff's application initially on October 11, 2019, and again upon reconsideration on March 17, 2020. (R. 90-116). Plaintiff filed a timely request for a hearing and appeared (via telephone) before administrative law judge Margaret A. Carey (the "ALJ") on August 20, 2020. (R. 39, 138-39, 187-91, 201-04). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Christine Fontaine (the "VE"). (R. 39-89). On October 6, 2020, the ALJ found that Plaintiff has severe impairments in the form of depressive disorder, delusional disorder – paranoid type, obesity, and diabetes mellitus, but that they do not alone or in combination meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 21-22). After reviewing the medical and testimonial evidence, the ALJ

concluded that Plaintiff has the residual functional capacity ("RFC") to perform medium work with certain postural limitations. He also retains the capacity to understand, remember, concentrate, persist, and perform simple routine repetitive tasks in a low stress environment, defined as having "simple work related decisions and routine changes in the work setting." (R. 25). Additionally, Plaintiff: cannot interact with the public or perform team tasks; can attend work for two hours at a time before needing a fifteen-minute break, which can be accommodated by routine breaks and lunch; cannot perform work at a fast pace but is able to meet daily quotas; and can work with only routine, occasional interaction with co-workers or supervisors. (*Id.*).

The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC could not perform Plaintiff's past relevant work but could perform a significant number of other jobs available in the national economy, such as hospital cleaner, cleaner, and auto detailer. (R. 31-32). The ALJ thus found Plaintiff not disabled at any time from the October 5, 2018 alleged disability onset date through the date of the decision. (R. 32). The Appeals Council denied Plaintiff's request for review (R. 1-3), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009); *Payne v. Colvin*, 216 F. Supp. 3d 876, 880 (N.D. Ill. 2016).

In support of his request for reversal or remand, Plaintiff argues that the ALJ erred in rejecting the opinion of Certified Nurse Practitioner ("NP") Elsy Joseph, M.S.N., R.N., who provided psychiatry services to Plaintiff during the relevant period. As discussed below, this Court finds that the case must be remanded for further consideration of NP Joseph's opinion.

3

**DISCUSSION**

A.     **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by the Social Security Act. 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

4

**B.     Five-Step Inquiry**

To recover DIB under the SSA, a claimant must establish that he is disabled within the meaning of the Act.  *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016).  A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009).  In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing "whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy."  *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (citing 20 C.F.R. § 404.1520).  If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five.  *Id.*

**C.     Analysis**

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in rejecting the opinion of NP Joseph, who provided psychiatry services to Plaintiff from November 2019 through March 2020.

5

**1.     Factors**

For claims like Plaintiff's that were filed after March 27, 2017, the ALJ was required to "evaluate and assign weight to medical opinions using a number of factors listed in the regulations, including: (1) supportability; (2) consistency; (3) the relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) the provider's specialization; and (5) any other factors that tend to support or contradict the opinion." *Vall B. v. Kijakazi*, No. 19 C 7759, 2022 WL 4551888, at *8 (N.D. Ill. Sept. 29, 2022) (citing 20 C.F.R. § 404.1520c(c)). According to the regulation, consistency and supportability "are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be," and, "[t]herefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision." 20 C.F.R. § 404.1520c(b)(2). "Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the opinion." *Michelle D. v. Kijakazi*, No. 21 C 1561, 2022 WL 972280, at *4 (N.D. Ill. Mar. 31, 2022); 20 C.F.R. § 404.1520c(c)(1). "[C]onsistency assesses how a medical opinion squares with other evidence in the record." *Michelle D.*, 2022 WL 972280, at *4; 20 C.F.R. § 404.1520c(c)(2). The ALJ may, but need not, explain her consideration of the other factors. *Michelle D.*, 2022 WL 972280, at *4 (citing 20 C.F.R. § 404.1520c(b)(2)). "While the ALJ generally need only minimally articulate [her] reasoning for how [she]

6

assessed a medical opinion, [she] must still consider the regulatory factors and build a 'logical bridge' from the evidence to [her] conclusion." *Vall B.*, 2022 WL 4551888, at *8.

### 2. Mental health records

Plaintiff's mental health treatment records date back to May 29, 2019, when he saw his primary care physician, Chantal Sylvie Tinfang, M.D., for a follow-up evaluation of major depression, among other conditions. (R. 420). At that appointment, Plaintiff endorsed sadness and loneliness in the wake of losing his job of nineteen years. (*Id.*). Dr. Tinfang noted that Plaintiff denied a depressive mood during a wellness exam but recorded in her review of systems that Plaintiff suffered from anxiety and depression. (R. 421-22). Nearly three months later, on August 14, 2019, Plaintiff returned to see Dr. Tinfang and reported feeling down, depressed, and hopeless more than half the days. (R. 534-38). During an independent internal medicine consultative examination with Muhammad Rafiq, M.D., three days later, Dr. Rafiq noted a history of schizophrenia but found that Plaintiff showed no signs of depression, agitation, irritability, or anxiety. (R. 456-57).

On September 10, 2019, Plaintiff underwent a psychological consultative examination with a licensed clinical psychologist, Jeffrey Karr, Ph.D. (R. 463-65). Plaintiff told Dr. Karr that he had recently moved because his "neighbors planted hidden cameras in [his] apartment," and he felt endangered. (R. 463-64). According to Dr. Karr, Plaintiff stated "with considerable conviction" that he believed his neighbors were therefore aware of his activities, which included his smoking cigarettes in his home. (*Id.*). As to Plaintiff's mental status, Dr. Karr found that Plaintiff's "[m]ood was grossly intact with no overt indication of dysphoria, elevation, or agitation," but his affect was heightened, he was

7

anxious and pressured, and he was eager to talk to the point of "overly verbal." (R. 464). Dr. Karr also once again documented that Plaintiff "persistently, with considerable conviction, related persecutory themes." (*Id.*). He noted that Plaintiff "indicated after the exam he would try to [stay] safe, staying to himself." (R. 465). Dr. Karr diagnosed Plaintiff with delusional disorder – paranoid type, with a history of polysubstance use, and stated:

> This claimant, with considerable conviction, persistently voiced persecutory themes–interpersonal discomfort. He acknowledges a very significant polysubstance use history, which allegedly has ceased, preceded by alleged multiple related treatment attempts.
>
> During this exam, he exhibited heightened affect but otherwise was euthymic, alert, seemingly cooperative.
>
> He appears to require assistance with funds.

(*Id.*). At an appointment with Dr. Tinfang six days later, she again noted anxiety and depression in her review of systems but found that Plaintiff's depression was improving. (R. 556-58). Two months later, on November 18, 2019, Plaintiff returned to see Dr. Tinfang and reported that he was hearing voices that were telling him "really bad stuff" about people. (R. 564). On examination, Plaintiff's mood and affect were sad and withdrawn, and Dr. Tinfang noted Plaintiff's auditory hallucinations. (R. 568). Dr. Tinfang assessed major depression with psychotic features that was not well-controlled, and she referred Plaintiff for psychiatry services. (R. 569-70).

Plaintiff underwent an initial psychiatric evaluation with NP Joseph on November 27, 2019. (R. 477). Plaintiff told NP Joseph that he "ha[d] been feeling depressed and hearing voices for a while." (*Id.*). He endorsed a depressed mood, anhedonia, irritability, and feelings of helplessness and worthlessness, and he reported having on-and-off mood swings and racing thoughts. (R. 478). Additionally, Plaintiff told NP Joseph that he: had been hearing voices two to three times per week for the past four years; believed that

8

there were hidden cameras throughout his apartment and at his workplace; and was paranoid that people were watching him or against him. (*Id.*). On examination, NP Joseph found that Plaintiff's mood was depressed and helpless and his affect was anxious, calm, and depressed. (R. 481). NP Joseph diagnosed Plaintiff with recurrent, severe major depressive disorder with psychosis. (R. 483). She prescribed Wellbutrin for Plaintiff's depression and Risperidone for mood stabilization and psychosis. (*Id.*).

Plaintiff returned to see NP Joseph the following month, on December 23, 2019. (R. 494). He told NP Joseph that he sometimes forgot to take his medication about two to three times per week and that he had been feeling a little better but still heard voices about three times per week and thought people were placing cameras in his home. (*Id.*). NP Joseph noted that Plaintiff was "paranoid like people are trying to hurt him" and sometimes "feels like people are against him for one reason or another," causing him to mostly stick to himself. (*Id.*). Plaintiff also reported feeling: depressed off and on due to his "life situations"; anxious and worried about financial issues and a son who was incarcerated; and irritable at times. (R. 494-95). A mental status examination revealed a depressed, irritable mood and a calm, anxious, and depressed affect. (R. 497). NP Joseph also noted during the exam that Plaintiff endorsed hallucinations, delusions, and paranoia. (*Id.*). NP Joseph continued Plaintiff on the same medication regimen. (R. 499).

That same day, NP Joseph completed a Psychological/Psychiatric Impairment Report, in which she stated her diagnosis of major depressive disorder, recurrent, severe, with psychosis. (R. 513-21). NP Joseph identified multiple symptoms of Plaintiff's depression and other disorders, including: delusions, hallucinations, odd beliefs and

9

mannerisms, paranoia and suspiciousness, social withdrawal and detachment, mood disturbances, difficulty concentrating or thinking, difficulty interacting with others, distractibility, irritability, persistent negative emotional states, low frustration tolerance, and inability to understand, remember, or apply information. (R. 513-18). NP Joseph opined that these were triggered by encounters with other people or groups, social functions, and travel. (R. 518). Furthermore, she opined that Plaintiff: has minimal capacity to adapt to changes in his environment or to demands not already part of his daily life; has difficulty interacting with others and marked difficulties in maintaining social functioning; suffers from deficiencies in concentration and persistence, resulting in frequent failure to complete tasks; and suffers from repeated episodes of deterioration or decomposition in work or work-like situations (R. 518-19). NP Joseph opined that Plaintiff's illness was not under control such that he could work in a non-sheltered work setting and she considered him unable to work even when he is not actively psychotic. (R. 519-20). In particular, NP Joseph stated that Plaintiff has difficulty maintaining a job due to his paranoia, noting that he was asked not to return to the temporary staffing agency in 2019 after only two days. (R. 520). Finally, NP Joseph noted that she had started Plaintiff on Wellbutrin and Risperidone, which could cause drowsiness, and that his response to treatment was "fair." (*Id.*).

At a February 5, 2020 appointment with NP Joseph, Plaintiff continued to report paranoia and a belief that people were trying to hurt him or against him, as well as hearing voices about two to three times per week. (R. 613). Plaintiff told NP Joseph, "I know people are placing cameras in my house," and he thought his ex-girlfriend was responsible. (*Id.*). A mental status examination again showed that Plaintiff's mood was

10

depressed and irritable and that his affect was calm, anxious, and depressed. (R. 616). Once again, NP Joseph noted that Plaintiff endorsed hallucinations, delusions, and paranoia. (*Id.*). NP Joseph assessed that, despite improvement, Plaintiff remained delusional and paranoid, and she noted that his medication adherence was questionable, as he had reported not taking his medication every day. (R. 613, 618).

The following month, on March 13, 2020, Plaintiff returned to see Dr. Tinfang and then NP Joseph. Plaintiff's examination by Dr. Tinfang revealed a sad, withdrawn mood and affect, and she noted auditory hallucinations. (R. 633). Dr. Tinfang once again determined that Plaintiff's major depression with psychotic features was not well-controlled. (R. 635). At the appointment with NP Joseph, Plaintiff reported hearing voices about two to three times per week, which at times told him that someone was watching him and at times he was unable to understand. (R. 598). He continued to tell NP Joseph that he believed his ex-girlfriend was placing cameras in his home and was paranoid that people were following him, trying to hurt him, or were against him. (*Id.*). On examination, Plaintiff: had a depressed, irritable mood; had a calm, anxious, and depressed affect; and endorsed hallucinations, delusions, and paranoia. (R. 601-02). NP Joseph again documented that, despite improvement, Plaintiff remained delusional and paranoid. (R. 603). She also again noted that Plaintiff's medication adherence was questionable, as he reported sometimes forgetting to take his medication two to three times per week. (R. 598, 603). NP Joseph increased Plaintiff's Risperidone dosage to address his psychosis and for mood stabilization. (R. 604).

Finally, on May 8, 2020, Plaintiff met with NP Joseph over the phone (due to the COVID-19 pandemic). (R. 583). Plaintiff reported compliance with his medication and

11

that he was doing good, but he continued to report hearing voices one to two times per week, which he ignored because he did not understand them. (R. 583-84). He also continued to be paranoid that people were following or against him. (R. 584). A mental status exam revealed a depressed, irritable mood, and Plaintiff endorsed hallucinations, delusions, and paranoia. (R. 586). NP Joseph continued Plaintiff on the same medication regimen. (R. 588).

### 3. ALJ's Analysis

The ALJ proffered several reasons for finding unpersuasive NP Joseph's opinions in the December 23, 2019 Psychological/Psychiatric Impairment Report, including that they were inconsistent with her own treatment notes and the medical evidence of record as a whole. (R. 29-30). Plaintiff contends that these reasons fail to support the ALJ's rejection of NP Joseph's opinions. The Court agrees.

As an initial matter, the ALJ indicated that she rejected NP Joseph's opinions in part because they opined on an issue reserved to the Commissioner. Specifically, the ALJ stated that "[w]hile an opinion of this nature may provide evidence of the severity of the claimant's impairments, the ultimate determination of disability is an issue reserved for the Commissioner." (R. 29). To be sure, a statement that a claimant is disabled or unable to work constitutes a statement on an issue reserved to the Commissioner and is "inherently neither valuable nor persuasive." *See* 20 C.F.R. § 404.1520b(c). While NP Joseph did opine that Plaintiff was unable to work, she also opined about specific work-related limitations with supporting signs and symptoms, which the ALJ was required to evaluate as a medical opinion.

12

The ALJ next indicated that she found NP Joseph's opinion unpersuasive because Joseph "likely relied heavily on the claimant's recount of his symptoms given that she drafted this opinion on the day of her second treatment session with the claimant." (R. 29). It is true, as the Commissioner notes, that an ALJ should consider (but need not explain) the length of the treatment relationship and frequency of examinations in evaluating the persuasiveness of a medical opinion. (Doc. 23, at 11); *see* 20 C.F.R. § 404.1520c(c)(3)(i)-(ii). But the ALJ's statement appears to take issue with NP Joseph's purported "heavy reliance" on Plaintiff's reported symptoms—rather than the length of the treatment relationship—without providing any discussion of how the treatment records support such a conclusion, including how Plaintiff's reported symptoms and complaints dovetailed with NP Joseph's own observations and findings. For example, NP Joseph's treatment records, including those from her first and second appointments with Plaintiff in November and December 2019, reflect her observations regarding Plaintiff's affect (anxious, calm, and depressed) and thought processes (organized or disorganized) during mental status examinations. (R. 481, 497, 586, 601, 616). Nor is there any indication that the ALJ considered how NP Joseph's specialty in Psychiatry, as well as her review of prior treatment records also documenting Plaintiff's hallucinations (including those of Dr. Tinfang from Cook County Health and Hospitals System) (R. 477, 564, 568-59), may have informed her assessment of Plaintiff's reported symptoms and limitations.

In any event, the ALJ's rejection of NP Joseph's opinions because of her potential reliance on Plaintiff's reported symptoms fails to consider the role of patient reporting in assessing mental impairments. *See, e.g.*, *Aurand v. Colvin*, 654 F. App'x 831, 837 (7th Cir. 2016) ("[A] psychological assessment is by necessity based on the patient's report of

13

symptoms and responses to questioning; there is no blood test for bipolar disorder. . . . Thus it's illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms."); *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) (explaining that "[m]ental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of her professional experience" and "the trained physician, not the ALJ, is better positioned to discern 'true' complaints from exaggerated ones") (citing *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015)); *Shaun R. v. Saul*, No. 18 C 4036, 2019 WL 6834664, at *7 (N.D. Ill. Dec. 16, 2019) (noting that "the Seventh Circuit has called ALJs on the carpet for dismissing opinions from psychologists and psychiatrists because they were based on a patient's subjective reporting"); *but see Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) (holding that the ALJ "adequately articulated his reasons for discounting" a state psychologist's opinion where the opinion was "based on only one evaluation and largely reflected [the claimant's] subjective reporting"); *Hager v. Kijakazi*, 20 C 788, 2021 WL 3088060, at *5 (W.D. Wis. July 22, 2021) ("[T]he court doesn't read *Mischler* and *Price* as prohibiting an ALJ from discounting a mental health opinion because it relies primarily on the claimant's subjective complaints. Rather, the key question is whether the report of the psychologist or psychiatrist indicates that he or she used 'professional expertise' to assess the claimant's credibility."); *Michael G. v. Kijakazi*, No. 19 C 6017, 2022 WL 4119775, at *15 n.6 (N.D. Ill. Sept. 9, 2022) (noting "some level of ambiguity in the caselaw on this issue" and concluding that "the caselaw stands for the proposition that an ALJ may properly discount an opinion [because it relies primarily on subjective reporting]

14

where the provider is too uncritical, and fails to show they assessed subjective complaints through the 'objective lens of their professional expertise'"). Here, other than postulating that NP Joseph "likely" relied heavily on Plaintiff's reported symptoms because of the length of the treatment relationship at that point, the ALJ provides no further discussion regarding NP Joseph's assessment of Plaintiff's reported symptoms.

The ALJ also found NP Joseph's opinions unsupported based on two treatment-related issues. First, the ALJ indicated that she rejected NP Joseph's opinion because she "primarily relied on conservative treatment modalities." (R. 29). In particular, the ALJ stated that "[t]here is no indication that Ms. Joseph seriously contemplated intensive treatment modalities beyond occasional counseling and psychotropic medication." (*Id.*). Some courts, however, view the prescription of psychotropic medication as "anything but conservative treatment." See *Chubb v. Colvin*, No. 12 C 168, 2013 WL 4540726, at *11 (N.D. Ind. Aug. 27, 2013) ("Although conservative treatment may reflect on the claimed severity of subjectively reported symptoms of physical ailments, 'where mental activity is involved, administering medications that can alter behavior shows anything but conservative treatment.'") (quoting *Baker v. Astrue*, No. ED CV 09-1078, 2010 WL 682263, at *1 (C.D. Cal. Feb. 24, 2010)); *Sonia H. v. Saul*, No. 19 C 2956, 2021 WL 1426878, at *3 (N.D. Ill. Apr. 15, 2021) (ALJ's decision to assign little weight to the opinion of an examining psychiatrist based on "conservative" mental health treatment lacked the support of substantial evidence where the claimant's providers "consistently prescribed her medication for anxiety and panic disorder," including psychotropic medication, and the ALJ "did not explain why she considered medication management of mental health symptoms to be merely conservative"). Here, the ALJ did not explain why she considered

15

Plaintiff's treatment regimen, including the administration of Wellbutrin and Risperidone, to be only conservative. Nor did the ALJ mention that NP Joseph increased Plaintiff's Risperidone dosage in March 2020 (R. 604), or identify what "intensive treatment modalities" or "more serious course of action" would have better supported the severity of NP Joseph's opinions. (R. 26, 29).

Regarding the second treatment-related issue, the ALJ suggested that she rejected NP Joseph's opinions because she may not have considered the impact of treatment compliance on Plaintiff's functional abilities. Specifically, the ALJ stated that Plaintiff "admitted non-compliance with his treatment regimen on the date of the opinion, which calls into question whether Ms. Joseph considered the effects of treatment compliance on the claimant's ability to function." (R. 30). It is true that, on the day that NP Joseph completed the Psychological/Psychiatric Impairment Report, Plaintiff told NP Joseph that he had been compliant with his medication but "sometimes he forgets to take his meds about 2-3x/week." (R. 494). NP Joseph assessed that Plaintiff was 90% compliant with his medication (R. 496), documented "Yes" as to Plaintiff's overall compliance with the treatment plan (R. 499), and noted that Plaintiff was educated on the importance of medication compliance. (R. 500). It is clear that NP Joseph thus addressed the issue of treatment compliance in her appointment with Plaintiff on the same day that she offered her opinions regarding his functional abilities. Other than Plaintiff's report to NP Joseph that he forgot to take his medication at times, the ALJ offers no explanation as to why such a fact would call into question NP Joseph's consideration of Plaintiff's treatment compliance when providing her assessment—especially considering the fact that NP Joseph routinely raised the issue of medication compliance throughout her

16

treatment of Plaintiff. (R. 494, 496, 499-500, 583, 586, 588-89, 598, 601, 603-04, 613, 616, 618-19). Given all of NP Joseph's treatment records, it is unclear to the Court why the ALJ would default to questioning NP Joseph's consideration of medication compliance as part of her assessment.

The ALJ's final reason for rejecting NP Joseph's opinions was that they were "simply inconsistent with the medical evidence of record as a whole, notably subsequent treatment records." (R. 29). But the ALJ does not explain how the records in the aggregate, both pre- and post-dating NP Joseph's December 2019 opinions, were inconsistent with the restrictions she assessed. Instead, the ALJ highlights that various treatment providers, including NP Joseph, "frequently observed that his attention, behavior, speech, memory, thought process, and judgment were within normal limits." (R. 27, 29-30). While the ALJ notes that Plaintiff reported auditory hallucinations to his treatment providers beginning in November 2019 (R. 26-27), she otherwise glosses over the fact that Dr. Tinfang also documented the hallucinations and assessed that Plaintiff's mental condition was not well-controlled both before and after NP Joseph completed the Psychological/Psychiatric Impairment Report in December 2019 (R. 568-69, 633, 635), and Dr. Karr, a licensed psychologist, noted in his assessment that Plaintiff "persistently, with considerable conviction, related persecutory themes." (R. 463-65).

Viewing the record as a whole, the ALJ failed to provide sufficient reasons for discounting NP Joseph's opinions and so the case must be remanded for further consideration of this issue.

17

**CONCLUSION**

For reasons stated above, Plaintiff's request to reverse or remand the case is granted and the Commissioner's Motion for Summary Judgment [22] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: August 11, 2023

_____
SHEILA FINNEGAN
United States Magistrate Judge